May it please the Court, my name is Jennifer Coughlin and I'm here today on behalf of Appellant Greg Gabriel. Our issues here today are to talk about what remedies are available when an ERISA plan breaches its fiduciary duty to provide accurate information to beneficiaries about their benefits entitlement. Our second major issue is whether Mr. Gabriel can stop his pension plan from denying his vested status in light of the express statements they over an issue that would have been irrelevant in the absence of his vested status, where the undisputed facts below show that he detrimentally relied on those representations. Isn't the equitable estoppel just a subcategory of the other, i.e. it's an equitable remedy? Logically it should be, but the cases do seem to treat them as different animals. That the cases like Spank talk about estoppel as a separate claim, but yes they should all be in the equitable family. Another sort of supervening question is, if this is a breach of fiduciary duty claim, it's presumably against the trustees in their fiduciary capacity, not against the plan qua plan, is that right? We sued the plan qua. I know we sued, but I'm asking whether the fiduciary duty part of what you, of the suit is against the Matthews and Cigna, that the plan was the one against whom judgment was ultimately entered. Because it was the plan that wound up having to be reformed, having to reform its own records, and having to write checks. Is that or is it that you're directing the trustees to do that with the plan? It just seems odd to me, because ordinarily, at least in trust law, when you're dealing with breach of the trust. But I believe that under ERISA, the plan itself has fiduciary duties. I'm not sure. Go ahead. And if I'm wrong on that point, that was one of the reasons why we sued the plan, the trustees, and everybody that we could get our hands on. You do have all the trustees, Mr. Finch, so. So, we do think that the three most important cases for our purposes are the Supreme Court Cigna versus Amara case and the Ninth Circuit's Matthews versus Chevron and Spink versus Lockheed. And we think that the district court's dismissal of claims on summary judgment can't be reconciled with the holdings of those cases. We've discussed the facts in the brief. Basically, getting the rug pulled out from under him when he was 69 years old and could no longer work, and being told that he didn't, in fact, have the pension that he had retired in reliance on, was a huge blow. So, the appeals committee concluded the fund told him he was infested back in November and December of 1979. And so then the question is whether, so in which case it wouldn't be reasonable to rely on later employee errors. What do we do with the appeals committee's conclusion there? Our argument on the appeals committee is the sole source for that factual finding that he had been informed is their acceptance of an unsigned letter in the file with no attachments that Mr. Gabriel says he had never received. There was simply no evidence that it had been mailed. And internal evidence that this unsigned letter in the file was just a draft. So, the question is whether that is something to which the plan is of no difference as to that finding. And we would say they aren't because that's not a question of plan interpretation. That is a simple factual question of did this document get mailed? Was this a final or was this a draft? So, in Walker, there's some language in a different context saying that it's the legal and factual findings are unitary and the Supreme Court intends us to apply the same standard of review to both. So, is that applicable here if we would have to review the plan's legal determinations for abuse of discretion and similarly when they apply their legal interpretation to the facts or they find the facts, would we have to give the same level of deference to the facts? I would think the two-part answer would be the plan in this case gives deference to the trustees to determine plan interpretation. There's not an explicit conveyance. Presumably, that would include applying the determining what the facts are that are relevant to the application of the plan. But this fact is really a fact about a possible legal remedy. It really doesn't have anything. I mean, you're not maintaining or at least not any longer maintaining that under the terms of the plan, he was entitled to this money. You're maintaining that for essentially external equitable reasons. To me, it's all one thing. But in any event, that there was a breach of fiduciary duty, I would say by the trustees and their delegates. And so this fact is a fact pertinent to an illegal issue that's for the courts. Or is that what you're saying essentially? Yes, Your Honor. And if I could have sort of a subsidiary gloss on that, even if you were to grant deference to the trustees finding that this document had been mailed, there's simply nothing in the trustees' decision that explains what that is based on. That we objected to its use. We submitted an affidavit saying had never received it. And we pointed out the reasons why one should believe that it hadn't been mailed, unlike the other correspondents in the file that actually did have exhibits and signature, etc. And the trustees said, well, let's move on. They say something about because the document he ultimately signed was similar to the one that was supposedly inside, attached to the second letter, not the first one. What they said is that the amount of the check referenced in the letter is the same as the amount referenced in the lease. That doesn't tell you that the letter was drafted after the release was, or that they were both working from the same plan. And I would also... But also, the Sphinx analogy is based on some set of information that he got from the plan, which was when? Later, at the time he retired, when he got a list that showed how much money he was getting. Yes. So, even so, you would still say there was a later second breach of fiduciary duty, essentially, which meant that, which he was entitled to rely on. Correct, Your Honor. And I think that particularly when you go into your pension plan, you know, 20 years later, and you say, am I vested? And they say, yes, you are. And they give you the same amount of money. So, the fact that you have a letter back in 1979 doesn't stop you, or doesn't mean that you can no longer reasonably rely on what the plan tells you many years later. Well, we do have cases saying a trust fund can't be equitably stopped where payment would conflict with the written agreement. So, I know the argument you made was that the agreement here was language that was relied on in SPINCs in this case. There was no SPINC looked at, correct and final, the correct and final. There wasn't any language like that. It was more just instructive. So, it wasn't clear to me that language that no equitable estoppel where payment would conflict with the written agreement could be, we could ignore that here. In the first place, there is similar language. Is there correct and final? Because that was what we relied on. Yes. It is at ER 231. It's section 14.02 of the plan. And it says that participants shall be entitled to obtain periodic reports showing the number of hours credited to their accounts, and that participants who contend they are entitled to be credited with a greater number of hours must file evidence within a year after the end of the disputed year, or the hours shall remain as credited. So, the words correct and final don't appear, which was, I didn't see them there, and you didn't read them. The words correct and final don't appear, but they do say that if you don't correct them within a year, then the hours shall remain as credited. So, that's the same thing. And it says that trustees shall determine the proper number of hours. So, in SPINCs, there were two sections, as I recall. One that said it will be correct and final. The other one, what is determined. And the other one said, here's what the standard is. And so, we said it was, there it was ambiguous. It said, notwithstanding any other provision of the plan, you can't become a member if you commence employment when you're 60 years or older. And then it says, it's ambiguous because the annual statements were deemed correct and final. Whereas Section 1402 just seemed to say that participants have an opportunity to challenge the number of hours. But I think it's more important that it says if you don't challenge it, the hours shall remain as credited. So, at the end of the day, you get to the same place. If you didn't act within a year, if the plan tells you you have six years of credit, you have a year to contest that. And if you don't, the hours shall remain as credited. So, you want to say that the failure to challenge a report is essentially so that whatever was originally there in the report remains unchallenged, is the same as in SPINCs where the determination, where the language says, this determination shall be correct and final. Is that your argument? Yes, Your Honor. It's substantially the same. Yes, Your Honor. And I would also note the district court said... In fact, that argument, the whole SPINC argument, is a pre-Cigna argument. Right? Correct. And Cigna has now told us that there is essentially a much broader authority to grant equitable relief for breach of fiduciary duty. Cigna was dealing in a situation in which there was some sense that one had to create ambiguity or there was no opportunity because of burdens to get any form of relief against the plan. But now, I don't know why we are hamstrung by that. And I would be delighted if the court would simply read Cigna as giving the court considerably more latitude than the district court evidently thought it had at the time that it entered the decision. If there was, in fact, a breach of fiduciary duty and misinforming him in a way that he detrimentally relied, then there seems to be some... I mean, it's not unlimited. You have to go back to traditional equitable remedies. But they may not depend upon proving this notion of ambiguity necessarily. And I think it's also true that for purposes of how this is coming up procedurally, we have an affidavit from Mr. Gabriel that sets out all those points. I recognize that the court has not ruled on those and rulings will be necessary later on. We got kicked out before we even got into the race on summary judgment. So at this point, we wouldn't even have to decide and we couldn't decide really even what remedy would be appropriate, simply that there may be one. Correct. Because so far what we have from the district court is that there may have been a wrong, but essentially there's no way of remedying it. And he decided this before Cigna? He did. And so in Skinner, in trying to interpret the Cigna case, the court, we gave pretty narrow readings to what remedies were available. But it seems like in concrete and other cases, if under standard fiduciary trust law trust principles there was a remedy, then that's how we should interpret it. But my question was, and I wasn't sure I understood fully from your briefs, is in this case, if there was a breach of fiduciary duty, it was between the trustees and the plan or the plan to its fiduciaries generally. And so what is the best case for the remedy? What remedy are you seeking and what is the best case that that would have been traditionally part of the trustee remedy? One of the remedies that we would seek would be to reform the plan records to show what they had showed clear up until 2004. So Skinner was saying, well, that's only available in the case of mutual mistake or fraud. And I don't think that's what you're alleging here. That's not. But in Matthews v. Chevron, they reformed the records to show that these particular beneficiaries had been terminated as opposed to retiring in order to give them the benefit that they would have gotten had the misrepresentations not been made without any finding or necessity of fraud. I think one of the things that makes Skinner sort of an awkward case is that the court found that there had been no detrimental reliance on anything. These misrepresentations may have been made in the plan description, but nobody read them. So people were trying to get equitable remedies without having really been done an equitable wrong, which I don't believe is the case here. To get an equitable remedy, somebody has to exercise equitable discretion, and that would be the district court in your view? Who would exercise the equitable discretion? I think it would have to be the district court in this case. Why isn't that the plan fiduciary in the first instance? Because I don't believe that equitable remedies that are separate and apart from the plan are within the province of the administrator, that that is ERISA law stepping in to make right what the plan does not cover. Because we're dealing with a case that sort of by definition, the literal terms of the plan, which the trustees are charged with enforcing, is not going to get make whole relief. And certainly in all the other cases we cited, the question of plan interpretation in the first place would be decided by some sort of an appeals committee. But when the rubber hits the road in terms of additional equitable remedies, that always seems to be done by the district court. And if I can reserve my 45 seconds. It's actually a negative 45 seconds, but you can reserve them. Okay. I guess it's good afternoon, your honors, and may it please the court. I'm Bruce McKenzie here on behalf of the fund. I'm afraid I've just broken the microphone. We'll send you a bill. So the district court in this case didn't have the benefit of Cigna. And my question is, one thing we could just do is send it back to him in light of Cigna. What do you think of that? Well, your honor, the district court really did address two of the three potential equitable remedies that were discussed in Cigna. And I would submit, your honor, that the essential. His hands were tied by Mertens and they couldn't do anything about it. Well, okay, let's cut right to the chase. First of all, I think Judge Burgess, and this is a long and convoluted history of this case, but I think he basically came to the heart of the case by saying in the most recent of his decisions on the merits, the fund's staff simply made a mistake here. Their error could not alter the vesting requirement beyond the explicit terms of the plan in question. And I would submit to this court that all of the material facts have been determined one way or another in this case. There is no ‑‑ it would be a waste of judicial resources to send back. Can you say that that was not a breach of judiciary duty? Because there was no ‑‑ Excuse me just a minute. Thank you. To tell Mr. Gabriel what he asked before he retired, whether he was eligible, and to mislead him for many years and to pay him, in fact, for all those years, and then to go and get the money back in a way that was detrimental to him. That's not a ‑‑ is your position that there was no breach of judiciary duty? That's correct, your honor. When you look at ‑‑ when you cut to the chase here, the only improper act that's alleged that's material to any of the issues before this court that was committed by any representative of the fund were the record‑keeping error made by the fund's administrative staff. And the fact that the staff ‑‑  But I would submit to the court that the Amera decision and the subsequent decisions where there are some limited equitable remedies available under ERISA go to the type of fiduciary breach that would rise to a level of a breach of trust. That is not alleged here. What is alleged is ‑‑ So if I have a trustee, if I have a trust fund and I have a trustee and I go to the trustee and I say, am I entitled to some money now? And he says, yes, here it is. And then 10 years later he says, oh, my goodness, I made a mistake. I've now spent all the money. And he says, I need all the money back. And I say, I can't pay it back unless I go into bankruptcy and my whole life is ruined. That is not a breach of fiduciary duty. I don't think it's a breach of fiduciary duty arising to the level of a breach of trust, your honor. This goes all the way back to the Aitken case that we cited in our brief. Trustees of these funds have to have the ability to rectify an administrative error. And that's really all that happened here. There was an administrative error, but the Supreme Court in the Amera case was very deliberate in tying the availability of equitable remedies to some type of fiduciary breach that would arise, I would submit, above the level of an administrative or clerical error. So are you saying this is just negligence, this is just a negligent error, that's not a breach of fiduciary duty? That's basically the distinction I'm drawing, your honor. Well, I would call it an administrative or clerical error. I mean, these happen in the administrative of these funds. And negligence can't be a breach of fiduciary duty? What I'm saying is that an error of this type should not. Let me ask my question first. Can you have a breach of fiduciary duty arising from negligence? Yeah, I'm interested in that, too. So under trust law principles is negligence. My understanding was negligence is not a breach of fiduciary duty, but I don't know if you have cases supporting that. I guess, well, I don't have a case that stands for that proposition, but I think you have to start from the standpoint that record keeping is not necessarily a fiduciary activity. When you look at the definition of a fiduciary under ERISA, it requires an exercise of discretion. And there are a number of cases. And record keeping, it was also communicating and informing him and answering his questions and misrepresenting to him the facts. I think the cases draw distinction, and this goes back to the cases that were considered by Judge Burgess. There is a distinction between an active or intentional misrepresentation and a mistake of fact or a communication that was based on a mistake of fact. So I found in my notes, so Matthews says mere negligence isn't enough for breach of fiduciary duty, but active misinformation is enough. And so active misinformation seemed to be knowing, have some knowing component. That's what Judge Burgess concluded, I believe. Okay, so he was relying on Matthews for saying that this fell into the negligence rather than the active misinformation. No, he was considering Matthews, is my recollection. Okay. And he used the terminology from Matthews about active misrepresentation, I believe was the language. And so this court in Skinner and also in the Fourth Circuit decision in the McGravey case. No, I'm really confused. Okay. Matthews says, in articulating Ninth Circuit law, we found a line of cases that does not require showing of intent. A fiduciary breaches its duty by providing planned participants with material with misleading information regardless of whether the fiduciary's statements or omissions remain negligent or intentional. That's from James v. Pirelli, Armstrong Tire Company, quoted in Matthews. So why are you relying on Matthews? Because in Matthews, there was a distinction drawn between active misinformation. I'm sorry, I said misrepresentation. What is part active misinformation? The distinction drawn in Matthews is between active misinformation and negligent misstatement. I'm saying what happened here was a negligent misstatement as opposed to active misinformation, for what that's worth. But I think, again, and this goes back to the Mertens case and Justice Scalia's comment, that we're dealing here with a risk of 502A3, which is not an unlimited cure-all. The Supreme Court did say in the Amera case that there are some limited equitable remedies under 502A3, but the statute itself is limited to remedies that would enjoin a violation of Title I of ERISA or a breach of the terms of the plan or to redress such violations. And I think it was significant in the Amera case that there was an allegation that there was a breach of specific Title I of ERISA sections, specifically those dealing with the form and content of the summary of the plan description. So if there is no violation of ERISA by the plan fiduciaries of an express term of ERISA or violation of the term of the plan, what we are saying is that all of the discussion about the equitable remedies that might be available hypothetically in some circumstances do not fit the situation where the only thing that happened here really... How much money does it take? Well, that's another element of this, because Mr. Gabriel did receive benefits for close to five years, and that was a total of $80,000, which the plan left on the table. We initially made a counterclaim to recover that, dropped that. So basically in terms of where he ended up in reliance on the misrepresentation, it's the fund that's out of pocket here. So the fund breached its duty to its other beneficiaries, right, by paying out money that he wasn't entitled to? That's correct. And, again, in terms of if the argument is detrimental reliance, when it was finally discovered that a mistake had been made and the benefit was ultimately terminated, his argument really is, well, if I had known that I wasn't vested and I didn't have a benefit here, I would have continued to work. So in that sense, what he's really asking for is not a benefit but a lost wage replacement. And if he were, in fact, able to continue working at age 67 or whatever it was, when the benefit was finally terminated, he had that option. So that really cuts against the detrimental reliance, because he got what we told him he was going to get for some five years. I asked the question for a different reason, and you never did give me a money estimate of how much money we're talking about. The dollar figure is $1,230-some dollars per month for life. I guess what I'm wondering is whether there's any point, and whether you've tried mediating this case and whether there's any point. We certainly did, Your Honor. Is there any point? We have, as you may know, very good mediators at court. Is there any reason to see whether they can help you settle this case? No. I mean, for obvious reasons, we hope that the mediation would produce something it did not. That's all I can tell you really about that. But if I might. But it's not huge amounts of money. As I'm seeing it, it's not huge amounts of money. It's not. Well, no, but it's a lifetime benefit. I mean, that's the difference. He's fairly old at this point. Well, when you think about the larger consequences of this, I mean, it is the fact. They represent a number of these trust funds. They do make mistakes. The administrative offices make mistakes. They have to be able to correct those mistakes without having to pay a lifetime benefit to somebody who really did, according to the trustees of the committee, have knowledge of what the rules were. And just if I can nail down that point, there was substantial evidence to support the finding, and it's tracked in our brief starting on page 6. They can correct things if they do it soon enough. The problem here is it took him so long to figure out the error, so he's no longer go back and fill in. I mean, he was a couple of years short. If he had been told, you know, he stopped working in, what, 78 or something. If he had been told 10 years later even, then he might have been able to go back and do something about it. Well, but the adverse of that, Your Honor, is he was told very definitely in 19- Well, she says he wasn't, and that's part of the- Okay, well, but there's a fine- Excuse me just a minute. Thank you. I don't even know what I was going to say. The trustees determined, based on very substantial evidence, that he was advised twice in 1979 that he was not eligible and that he would have to do something further to become festive. Is that a finding to which Jefferson's in? Yes. Why? It definitely is because it's supported by substantial evidence, and the substantial evidence is- That's not what I'm asking you. Is that the kind of a finding which is not a plan administrative decision as such, right? It really has-because, I mean, their position, qua plan administrators, is that the plan does not permit them to pay incentive, which is, you know, under the terms of the plan. It's correct. The question of whether or not he got this letter is pertinent to the equities of the case, which would be before Judge Burgess if there was a remand to look at equitable remedies, but it really doesn't have anything to do with the plan's administration, does it? Well, it has to do with the claim that was presented to the committee, which was there should be equitable relief here because he didn't get the letter or he doesn't recall getting the letter. I would submit that that was definitely part of the record. I thought that claim wasn't submitted to them. I thought what happened was there was a whole other set of litigation before the committee, having something to do with something else entirely. What? They said that, oh, whoops, we made a mistake, we want all of our money back, and then he didn't file another claim, he just went off without a lawsuit. Well, he did initially, but Judge Burgess actually remanded the claim for benefits back to the committee. That's the committee hearing I'm talking about. But that was on the question of whether the plan covered it or didn't cover it. Well, that was supposed to be what was presented, but then counsel came in and re-argued the estoppel argument, and so the committee dealt with that because that was what was presented to them, and a transcript of the hearing is a part of the record here. But the important part of that is that the critical record from the plan's general counsel starts out by, and I'm paraphrasing, but the letter is in the record, we need to make some corrections to the dollar figures on the settlement agreement, and here are the new figures. And if you compare the new figures with the document that Mr. Gabriel admitted that he signed, they match up. So what? Well, because the letter by its terms was enclosing the settlement agreement. And the prior letter... They also said that they had spoken to him. They also said that they talked to him as we talk to you. So we have no idea whether they sent the form with or without the letter. It is a, at minimum, it is a reasonable factual determination. Why? I don't see any connection between the fact that there was the form, that he got the form and then he got the letter. Well, because the letter refers to the form and enclosed the form. I mean, the letter said... And then they could have just decided to send it without the letter. Well, that's, but that is... Especially because it said, well, we talked about this. The test is substantial evidence. And... To me it sounds like no evidence. Well, that's your judgment as a court, possibly. But you are required to defer to the trustee's judgments on factual matters like that. If there is any substantial evidence. And we're submitting that the circumstances also... Why would they have an unsigned letter in the file? The other letter was signed. That's the way that... I have hundreds, thousands of unsigned copies of letters in my file. The other copy is signed. The other copy they have in the letter is signed. From a month earlier. Well, I can ask the court to take judicial notice of the fact that the record-keeping systems of many, many, many folks do not contain signed copies of file copies. Yes, except this one, which was a month earlier, was signed. Well, you know, the trustees made that determination. And I would ask the court to keep in mind that Mr. Gabriel was not an educated laborer. He was a business owner. And we know, and it's undisputed, that he participated in the Speer settlement as a non-vested participant. Look, he wrote a letter in 1997, right, saying, am I eligible? Correct. If he knew he wasn't eligible, then there was no reason for him to write that letter. He would have expected to get an answer back saying, you're ineligible. He didn't get that letter back. We can, I guess, hypothesize about why he sent that letter, but the fact is... Because he thought somebody was going to screw up? Pardon me? Because he thought there would be a mistake made? I don't know. He did not explain why he wrote the letter when he did, nor did he explain the hiatus. There was a hiatus between 1979 and 1997 where there was no communication back and forth either way. So... I mean, either he never got the letter or he completely forgot about it, which is totally possible. Well, he didn't, certainly he did not forget about the $21,000 that he received from the Speer settlement. I thought that that was understood to be, or I don't even know what that's about. It hasn't been explained anywhere in the record, and I thought the common understanding was that I thought the settlement itself said it's exclusive from anything else you may be entitled to. Well, but in order to participate, she had to be a non-vested former participant, which, in fact, he was. So that part we got right. Again, I think the terms of the facts, and it's... I don't know what's in the record, but did Mr. Gabriel apply for that money, or was it just sent to him? He applied. The sequence was that he made some kind of an inquiry. He was told erroneously, yes, you have a benefit here. Then there's a process where... I am talking now about the settlement that you were just discussing. Oh, yes. No, he had to make a claim or provide some kind of information. It was not an opt-in, opt-out type of settlement, but I think he had to, and that was actually administered by the plaintiff's counsel, but he had to do something in order to participate in the settlement, and I think it may have been just provide a mailing address. It may have been that simple. Thank you. Thank you, Your Honor. We'll give you a minute for rebuttal. I think the Speer settlement is a red herring. The district court noted in the record at ER 34 that the settlement states that it will not affect the rights of any participant whom the plan already recognizes as vested, which would apply to Mr. Gabriel. So there wouldn't have been any red flag to him that he wasn't vested because he got a check as part of this other settlement. So what about this finding that he got the letters in 79? That's what we were discussing earlier. There's first a question of whether there's any deference owed to a factual determination that has nothing to do with plan interpretation but has everything to do with whether or not the plan met its fiduciary duty, which is usually not something that you settle at the administrative. There's no case law on that. That's something we'd have to decide what deference, what degree of deference. That's true. And then if you do decide to give it deference, you'd have to decide whether there was anything to support it. When there was no evidence whatsoever in the record about what the standard practices were, whether they routinely put unsigned letters in the file, whether they didn't bother about enclosing the enclosures, et cetera. And thirdly, if it's relevant, then you'd have to decide why it's relevant. And that would be the third point. We've also discussed in the briefs the fact that Mr. Gabriel, you know, today still thinks that he's got some additional credit from the 80s, and he asked them to go back into their files and look for it. And that's when this whole thing got discovered, when they quit looking at their computer records and went back and saw, you know, the little handwritten, take away these credits notes that were in the file. So the idea that Mr. Gabriel is somehow rubbing his hands waiting for the plan to screw up in 1997 when he applies makes no sense. This is a man who thought he was vested, retired in reliance on being vested. It doesn't matter. If he did, in fact, get those letters, the fact that he thought so, he might have been self-indulgent, he might have forgotten, it doesn't make any difference, right? Well, the difference it made. But he did write this other letter and get the other one. Can we let counsel answer the question? Counsel can. What she said. Yes, when in 1997. Why don't you answer the question? That I've forgotten whether, I've forgotten the form of your question, but without answering yes or no, the 1997 facts take precedence. Whatever happened in 1979. Why? If he gets a letter in 1979 telling him you're not vested, you need more time, more hours, more years, why isn't that it? In the first place, because he frankly thought he had gotten more hours in the 1980s. In the second place, the plan had changed drastically between 1979 and 1997. The concept of a 10-year vesting plan was very trendy in the 70s, but they've obviously gotten a lot shorter in recent years. As a legal matter, that turns out not to be relevant. You live and die. We're talking equitable stopper here. We're talking equitable stopper. If he gets a letter telling him, look, let's say in fact he in fact gets that letter, and there's a finding by whoever it is that he got that letter, what equitable stopper claim does he have? I mean, he's been told you are not vested. He's got the 79. At that point, he's got plenty of time to fill in the years. He doesn't do it. Why isn't that the end of the matter? Because in 1997 he asks the plan again, and they tell him, yes, you are. So what? I mean. He could. It's a question of was his reliance reasonable, and it could have been reasonable. Reliance, if he gets a letter in 1979, how can he have reliance in 97? Because he asks the question anew and gets a new answer, and this is sort of theoretical because our position is he never got the previous letter. Well, I understand, but you have to accept. So in order to answer my question, you have to accept the basis of it. If you want to sort of reject the basis of it, we have a different conversation. So you have to accept the basis of somebody, whoever it is, district court, the committee, whoever it is, makes a determination, yes, there was a letter he got in 79. And I'm just wondering, what equitable claim has he got left at that point? Because after the passage of 18 years, it's no longer reasonable to think that nothing has changed. You can go back and resuscitate a claim of equitable, somehow it's 18 years later when you've been told in 79 that, no, you haven't got enough years. That's a little much. It's not a question of resuscitating the 18-year-old claim. It's a question of the claim arising in 1997 when they say, yes, in fact, you are vested and you can get this pension of $1,200 a year for life and you retire in reliance on that. How old was he in 97? He was 62 years old and he was, the record shows, capable of working. He did, in fact, go back to work as an OSHA inspector on a two-week-a-month basis starting in 2001 and worked for a couple of years. The problem is by the time they told him that he was invested in 2004, that was post two knee surgeries, a medevac because of diverticulitis, and he had to retire medically for real at that point. So by the time that they told him in 2004, we made a mistake and you're not entitled to any retirement, he no longer had the option of working. Had they told him back in 1997 he was never going to get a pension, he would have worked all the hours that he possibly could from that point on and that is one of the things that he has simply lost, regardless of what you decide about the 1979 level. He would have had to work for the right employer, right? I mean, frankly, he could have worked for any employer and he would have a much larger bank account than he does now because he retired at 62 and has been living off Social Security and his pension. That stopped in 2001. But could he have done something to entitle him to the lifetime benefits which opposing counsel says he's seeking now? Not from AEPF, not after that length of time. He would have had to have done that sooner. So I'm sorry, so what could he have done? He could have gone to work. He could have continued to work. So he'd have some other money. Yes. There's nothing he could have done to reinstate his benefits. Not if they had told him in 1979 that you have to get your act together in the next, I forgot whether it was seven or eight years, to get your final years. Okay. Thank you. James, it's time to move. We are adjourned.
judges: Kozinski, Berzon, Ikuta